[Cite as *State v. Friend*, 2025-Ohio-3270.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JAMEY FRIEND,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 BE 0055

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 24 CR 123

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed and Judgment Entry modified.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Brian A. Smith*, Brian A. Smith Law Firm, LLC, for Defendant-Appellant.

Dated: September 10, 2025

**Robb, P.J.**

**{¶1}** Defendant-Appellant Jamey Friend appeals after a jury convicted him of four offenses in the Belmont County Common Pleas Court. He sets forth six assignments of error, raising issues involving the manifest weight of the evidence, the sufficiency of the evidence, speedy trial, the characterization of a witness as hostile, the adequacy of the consecutive sentence findings, and the labeling of all four prison terms as mandatory. As conceded by the state, the latter assignment of error has merit because only the first of the four prison terms was mandatory. The other assignments of error are without merit.

**{¶2}** Accordingly and for the following reasons, Appellant's convictions are affirmed, but the sentence is modified so that only the sentence of 7 years on count one aggravated drug possession, is labeled a mandatory prison term and the consecutive sentences imposed on counts two, three, and four are no longer labeled mandatory prison terms.

STATEMENT OF THE CASE

**{¶3}** On May 18, 2024, shortly before noon, a pickup truck reported as stolen in West Virginia led law enforcement officers on a lengthy pursuit on I-70 East, starting east of Columbus, traveling through four counties, and ending in Belmont County. After more than an hour of pursuit, the vehicle traveled off the freeway until getting stuck in a wet area. It took another hour for officers to coax Deidra Hines from the passenger seat and then Appellant from the driver's seat. Immediately after being placed under arrest, Appellant was treated at the hospital because, near the end of the pursuit, he swallowed the contents of a packet containing a substance he announced was fentanyl. Methamphetamine (meth) was recovered from the truck at the scene and from the passenger at the hospital.

**{¶4}** Bond was set at Appellant's initial appearance on the four counts charged in Belmont County. He was bound over to the grand jury after a preliminary hearing. On June 6, 2024, Appellant was indicted on the same four counts.

**{¶5}** Count one was for aggravated possession of drugs, a second-degree felony due to the weight of the meth exceeding five times the bulk amount. R.C. 2925.11(A),(C)(1)(c). Count two was for failure to comply with an order or signal of a police officer, a third-degree felony due to the substantial risk of serious physical harm.

R.C. 2921.331(B),(C)(5)(a)(ii). Count three was for tampering with evidence (for swallowing the substance in the packet), a third-degree felony. R.C. 2921.12(A)(1),(B). Count four was for receiving stolen property, a fourth-degree felony due to the item being a motor vehicle. R.C. 2913.51(A),(C).

{¶6} Appellant filed a motion to dismiss on October 4, 2024, claiming a violation of his speedy trial rights. The court denied the motion. (10/9/24 J.E.). The jury trial commenced the next day.

{¶7} At trial, the victim (owner of the pickup truck) testified she was days from turning 80 at the time her vehicle was stolen. She explained she was very ill in February 2024 and thus employed Deidra Hines as a live-in caretaker at her Parkersburg, West Virginia home beginning in February 2024. (Tr. 265-267). Deidra allowed Appellant to move into the victim's house in April 2024. (Tr. 276).

{¶8} On May 17, 2024, the victim went to a casino with Deidra and provided Deidra a small amount of money to gamble. Around 1:00 p.m., Deidra left in the victim's truck to buy milk but never returned to retrieve the victim. (Tr. 269-271). Eventually, the victim obtained a ride from a person who assisted her in breaking into her own home because her house key was with the car key. (Tr. 271-272). Later that night (just before 10:00 p.m.), she reported the truck as stolen. (Tr. 273, 361). After the chase happened the next day, the victim retrieved her truck. She said it had two flat front tires and two broken rims. (Tr. 276).

{¶9} Trooper King testified he joined the last hour of the pursuit of the pickup truck upon receiving a call for assistance from Fairfield County officers. He entered the freeway, waited in a crossover in Muskingum County, and followed the vehicle for nearly 60 miles. (Tr. 144-147, 168-69). The truck reached speeds up to 100 mph. When the trooper turned off his emergency lights through a construction zone, the truck slowed to 90 mph and then to 80 mph but returned to 97 mph when the trooper reactivated his lights after clearing the construction zone. (Tr. 154-157). The pickup truck passed a semi-truck on the right berm and then reached 100 mph again. (Tr. 157-158).

{¶10} In Guernsey County, the first set of spike sticks were deployed. Although the front left tire was affected, the truck continued driving at speeds as high as 68 miles per hour for another 25 miles while tire and rim debris flew at the trooper's car. (Tr. 160-

162).  Trooper King noticed the front seat passenger reaching into the back seat of the truck and moving a backpack to the front seat.  (Tr. 166).

**{¶11}**  In Belmont County, the second set of spike sets was successfully deployed. (Tr. 167).  During the chase, the female passenger communicated with dispatch and with pursuing law enforcement; during one of the conversations, it was reported the driver took a gram of fentanyl.  (Tr. 175).  A few miles after the second set of spikes, the truck drove off the road, into the grass, and down an embankment as if trying to flee to an underpass. However, the underpass area was a wetland rather than a road, and the truck remained stuck despite the spinning wheels in an attempt to continue fleeing.  (Tr. 174, 193, 198). Trooper King estimated they passed more than 100 vehicles during the pursuit, with the truck coming close to colliding with some of those vehicles.  (Tr. 170-171).

**{¶12}**  When Trooper King alighted from his cruiser, he visually confirmed the radio and phone reports that the driver was male and the passenger was female; he also saw them kissing.  (Tr. 171-172, 175-176, 181).  After the chase, a standoff with negotiations occurred for another hour.  When Appellant was finally apprehended, he was offered Narcan for the reported substance consumption.  He refused while claiming he was allergic to it.  Trooper King's dash cam and body cam videos were played for the jury. (St.Ex. 1-2).

**{¶13}**  Sergeant Moore of the Ohio State Highway Patrol testified to pulling alongside the truck during the chase in an attempt to influence the occupants to look at him.  He saw the male driver looking straight ahead; he also saw a female passenger. (Tr. 190-192).  Sergeant Moore spoke to the female and then to Appellant on the phone at various times during the incident.  After the truck became stuck in the grass, Sergeant Moore noticed furtive "digging" or reaching movements by the driver while law enforcement waited with assault rifles on the overlooking freeway bridge.  (Tr. 195-196). After finally alighting from the passenger door, the female was reluctant to leave the area of the truck and was subsequently escorted up the hill to the freeway.  Upon Appellant's eventual apprehension, he asked, "Why did you handcuff Deidra?  She didn't do anything."  (Tr. 204-205).  Sergeant Moore's dash cam and body cam were played for the jury.  (St.Ex. 3).

**{¶14}**  Trooper Wilcox, who deployed the spike strips in Belmont County, testified to obtaining "a very good look" at the occupants as the truck hit the spikes; he too saw a

male driver and a female passenger. (Tr. 219-221). Trooper Wilcox remained with Appellant at the hospital and took his statement, which was read to the jury. (St.Ex. 7). In this statement, Appellant confirmed he was living at the victim's house with Deidra and taking the victim to the bank and then to the casino in Parkersburg, West Virginia. (Tr. 224-226).

**{¶15}** Appellant said, "After dropping [the victim] off at the casino, I used some meth. The next thing I recall, I seen red and blue lights behind us. I just kept driving until I ran off the road and got stuck." When the officer asked him to clarify what drugs he took that day, Appellant answered, "Meth, fentanyl, and weed pen." Upon being asked if he stole the truck (the prior day), Appellant claimed, "No. We was going back to pick up [the victim] from the casino." Appellant said he did not know why he fled from the police. (Tr. 225); (St.Ex. 7).

**{¶16}** To hospital personnel, Appellant confirmed: he used "a couple chunks" of meth; he orally took "quite a bit" or a "pile" of a different substance that he described as fentanyl; and he took "hits" from a marijuana e-cigarette. (Tr. 364-365). His drug screen came back positive for cannabinoids, meth, and ecstasy/MDMA. (Tr. 367).

**{¶17}** Trooper Byrd testified he inventoried the truck after it was towed from the grass. In the glove compartment, he found a bag of meth and drug paraphernalia. (Tr. 211-214). This substance contained meth and weighed .1342 grams. (St.Ex. 4, 6). The paraphernalia included two glass smoking pipes with burnt residue and a push rod (used to push a filter into the pipe). (Tr. 348).

**{¶18}** Sergeant Brannan testified she watched as Appellant was coaxed out of the driver's side of the vehicle. She then accompanied Deidra Hines to the hospital to take her statement. (Tr. 343-346). Deidra pointed Sergeant Brannan to a bag of meth located inside the pillow transported with her from the ambulance to the hospital.

**{¶19}** Testing confirmed this substance contained meth and weighed 21.4831 grams (more than 5 times the bulk amount). (Tr. 353); (St.Ex. 5-6). This meth was still in large chunks whereas the lesser amount of meth in the glove compartment appeared broken down into small particles for readier use. (Tr. 351-352). The parties stipulated to the lab report, Appellant's hospital records, and the status of meth as a Schedule II controlled substance with the statutory bulk amount being 3 grams. (Tr. 11-12, 230-231).

Case No. 24 BE 0055

{¶20} Five of Appellant's jail calls were introduced as evidence at trial. (St.Ex. 10-11). On June 23, 2024, Appellant said he missed everyone including Deidra, the call recipient said Appellant knew what he was doing and he did this to himself, and Appellant responded, "yeah, you're right."

{¶21} A video call for Appellant's birthday (July 9, 2024) included Deidra's daughter, who had also just accepted a jail call from her mother so Appellant could speak to Deidra while both were incarcerated pending their trials. Appellant and Deidra expressed their love for each other multiple times in the call. Appellant also said, "They're missing 5 grams out of the 26 grams they took to the lab."

{¶22} In a September 7, 2024 jail call, Appellant expressed concern about his case to the call recipient by complaining Deidra "wrote a ten page paper on me." Then, on October 2, 2024, he told a call recipient these were not his charges but were Deidra's charges. In the last jail call, placed on the first night of the two-day trial, Appellant told someone, "She is coming tomorrow and telling them she was driving."

{¶23} The state then called Deidra Hines to the stand. Deidra testified she pled guilty to drug possession and receiving stolen property and was serving a four-year prison term with hopes of judicial release after two years. (Tr. 283-284, 329). She disclosed Appellant was still her fiancé, his status for the past five years. (Tr. 285). Deidra confirmed they were living with the owner of the pickup truck when they went to the bank and then to a gambling center around noon on May 17, 2024.

{¶24} She said she left the casino for the grocery store with Appellant driving the truck, but instead of returning to pick up the truck owner, Deidra ended up purchasing meth in West Virginia. (Tr. 289-291). She used some meth "[r]ight after *we* got it" but then claimed she could not remember if Appellant immediately used some as well. (Emphasis added.) (Tr. 290-291).

{¶25} Deidra disclosed they decided to leave town in the truck and called the truck's owner to tell her a lie about being pulled over by the police (before actually encountering police, apparently to delay a police report). (Tr. 290, 293-294). After leaving the victim at the casino and buying meth, they went to Athens, Ohio and stayed one night in a motel.

{¶26} The prosecutor asked, "Did you use more methamphetamine?" She replied, "We used - - I used a lot." When asked if she saw Appellant use more meth at

that time, she claimed, "Not - - no actually. I mean, I'm sure he did, but, I mean I was really, really, really high." (Tr. 291).

{¶27} On May 18, 2024, they drove toward Columbus with plans to sell the truck and obtain a different vehicle. Deidra testified she initially drove to Hocking Hills where they ate. (Tr. 292). When asked who drove when they left that location, she testified she was the driver through the police chase, while saying, "Everything started getting - - it's really fuzzy . . . I think I was [the driver]. I was pretty sure I was." (Tr. 294-295).

{¶28} As this was contrary to her claims to law enforcement during the chase and contrary to her statement to Sergeant Brannan in the hospital after the chase, she was declared a hostile witness and her prior statement was discussed. Deidra said Appellant claimed to be the driver to protect her. She agreed she told 911 or officers multiple times that Appellant was the driver. When asked if they switched seats (since she alighted from the passenger side and he alighted from the driver's side), she answered, "We had to have, yeah. I don't remember exactly what happened." (Tr. 310-312).

{¶29} Deidra also testified to witnessing Appellant consume what he said was a gram of fentanyl during the chase after the tires were blown out. (Tr. 315, 317, 320, 326). Her testimony indicated the larger bag of meth (found in the pillow at the hospital) had been in the truck before she placed it down the front of her pants during the chase to hide it. (Tr. 317-318). She claimed her prior statement that Appellant told her to "stuff the ice" was untrue as it was her own decision. (Tr. 319, 325). She disclosed having no knowledge of the smaller bag of meth in the glove compartment. (Tr.331-332). She additionally testified her report of being kidnapped was untrue. (Tr. 327-328).

{¶30} The jury found Appellant guilty as charged. The trial court sentenced him to 7 years on count one, 36 months on count two, 24 months on count three, and 12 months on count four, all to run consecutively and described these 13 years as "mandatory." The court explained Appellant's maximum sentence was 16.5 years because an additional 3.5 years could be added depending on his behavior in prison. *See* R.C. 2929.144(B)(2) (indefinite sentencing scheme calculations). Appellant filed a timely notice of appeal from the November 6, 2024 sentencing entry.

ASSIGNMENT OF ERROR ONE

{¶31} Appellant sets forth six assignments of error. His first assignment of error challenges the weight of the evidence on all counts, and his second assignment of error

contests the sufficiency of the evidence on count one. A conviction necessarily is supported by sufficient evidence if it is supported by the weight of the evidence. *State v. Whitacre*, 2023-Ohio-1029, ¶ 76 (7th Dist.). Logically, this is because reversal based on weight of the evidence can occur only after the prosecution presented sufficient evidence and persuaded the jury to convict. *State v. Thompkins*, 78 Ohio St.3d 380, 388 (1997) (and a reversal on sufficiency does not allow retrial while a reversal on weight of the evidence does). We chose to address the following assignment of error on sufficiency first:

{¶32} "Appellant's conviction on Count One, Aggravated Possession of Drugs, a second-degree felony, was not supported by sufficient evidence."

{¶33} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *Thompkins* at 386. In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether a rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138 (1998); *see also State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (viewing reasonable inferences in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences).

{¶34} This is the same standard applicable to a defendant's motion for acquittal during trial. *See State v. Williams*, 74 Ohio St.3d 569, 576 (1996); Crim.R. 29(A). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). Accordingly, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶35} Drug possession has the following elements: "knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). This offense is aggravated drug possession "if the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of [certain inapplicable drugs]." R.C. 2925.11(C)(1). The offense is a second-degree felony with a mandatory prison term where "the amount of the drug involved equals or exceeds

five times the bulk amount but is less than fifty times the bulk amount . . ."  R.C. 2925.11(C)(1)(c).

{¶36}  As stipulated by the parties, meth is a schedule II substance with a bulk amount of 3 grams.  Therefore, the level of offense here required proof Appellant possessed 15 grams or more of meth.  The parties stipulated to the lab report (St.Ex. 6), which showed both the small bag from the glove compartment (St.Ex. 4) and the large bag from the ambulance pillow (St.Ex. 5) contained meth.  The small bag of meth weighed only .1342 grams while the large bag of meth weighed 21.531 grams.

{¶37}  Appellant contests the sufficiency of the evidence to prove he had actual or constructive possession of the large bag of meth.  He points to Deidra's testimony suggesting this meth belonged only to her.  He also emphasizes Deidra's testimony about being the driver during the pursuit and concludes the evidence of his constructive possession of the meth is inadequate if he was not the driver of the vehicle transporting the meth.  Appellant points out if the evidence was only sufficient to find he possessed the small bag, then the drug possession offense would decrease to a fifth-degree felony.  R.C. 2925.11(C)(1)(a) (with lesser sentencing options and without a mandatory prison term).

{¶38}  Possess means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."  R.C. 2925.01(K); *see also State v. Hankerson*, 70 Ohio St.2d 87, 91 (1982) (the defendant must be "conscious" of the object's presence).  "A person can be in possession of an object through immediate physical possession or constructive possession, which involves dominion and control over an object."  *State v. Miller*, 2024-Ohio-4520, ¶ 45-46 (7th Dist.), citing *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976) and *Hankerson* at syllabus ("Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession.").  We note the drug possession statute prohibits more than possession; it also covers obtaining (or using) the substance.  R.C. 2925.11(A).

{¶39}  Here, Deidra Hines placed the large bag of meth in the ambulance pillow after taking it from the truck and putting it down the front of her pants, which she wore under a dress.  (Tr. 317-318).  Appellant was her long-time fiancé, and the jury heard the

Case No. 24 BE 0055

two express their love for each other in a jail call while each was incarcerated. At trial, Deidra changed her initial story. For instance, a portion of her testimony claimed she believed she was driving during the pursuit (while noting her memory of it was "really fuzzy"). (Tr. 294-295). This was despite her opposite statements to law enforcement during the chase, standoff, and medical treatment, wherein she declared Appellant was driving.

{¶40} This portion of her testimony was also contrary to the testimony of the sergeant who saw a male driver and female passenger when he pulled up next to the truck and the testimony of the trooper who viewed Appellant in the driver's seat just after the truck stopped and was spinning its wheels in the field. Nevertheless, when asked whether her testimony was true, she concluded, "I thought I was driving, but I guess I wasn't." (Tr. 316).

{¶41} As to the meth, Deidra claimed she entered the drug house to purchase the meth while Appellant waited in the truck. She also claimed it was her decision to put the large bag down the front of her pants, which was contrary to her prior statement saying the bag of meth ended up on her person after Appellant told her to "stuff the ice" during the pursuit.

{¶42} Deidra's new testimony still suggested a joint endeavor regarding the meth. She said, after leaving the owner of the truck at the casino, "we stopped and I got some methamphetamines" in Parkersburg, West Virginia. (Tr. 288-289). Although she testified she was the one who entered the drug house to purchase the meth, she was then asked, "Did you start to consume the methamphetamine at some point?" and she answered, "Yeah. Right after *we* got it." (Emphasis added.) (Tr. 289-290).

{¶43} Alternately, she claimed to not remember witnessing Appellant ingest the meth. However, Appellant's blood tested positive for meth, and there were two glass pipes in the glove compartment with the smaller bag of meth. Tellingly, Deidra testified, "We used - - I used a lot." (Tr. 291). Deidra also acknowledged being unaware there was meth in the glove compartment. Although Appellant argues this indicates that only a small bag belonged to him, the meth in the small bag had been crushed for readier use, suggesting to law enforcement that it was derived from the heavier bag of large chunks. Moreover, Appellant can be heard mentioning over a jail call that he believed they possessed (or initially obtained) 26 grams of meth.

Case No. 24 BE 0055

**{¶44}** Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001). For a sufficiency review, the question is merely whether "any" rational trier of fact could have found the contested element satisfied beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson*, 443 U.S. at 319. Again, reasonable inferences are evaluated in the light most favorable to the prosecution. *Goff*, 82 Ohio St.3d at 138; *Filiaggi*, 86 Ohio St.3d at 247. Contrary to Appellant's argument, a rational juror could conclude beyond a reasonable doubt that Appellant obtained or possessed the large bag of meth. As there was sufficient evidence of second-degree felony aggravated drug possession in count one, this assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

**{¶45}** The assignment of error presented first but addressed second makes the following argument:

"Appellant's convictions were against the manifest weight of the evidence."

**{¶46}** Weight of the evidence concerns the effect of the evidence in inducing belief, and our corresponding review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review).

**{¶47}** When a defendant argues a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

**{¶48}** It is the trier of fact who occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

"We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶49} Furthermore, where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Const., art. IV, § 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins* at 389.

{¶50} First, Appellant contests the weight of the evidence to support count one, aggravated drug possession. He uses much of the same reasoning as reviewed in the sufficiency argument related to this count, which we incorporate here. In addition to the argument on his possession of the large bag of meth, he adds an argument challenging the weight of the evidence on whether he possessed the small bag. Appellant relies on Deidra's new story for certain events, but she testified she was unaware there was a small bag of meth in the glove compartment. Regardless, the small bag was found in the glove compartment of the truck next to *two* glass smoking pipes. As the state points out, Appellant tested positive for meth, he indicated to hospital personnel that he had meth in his system, and the vehicle he occupied for multiple hours contained two bags of meth before the occupants alighted from it. One bag contained large chunks, and one contained smaller consumable particles.

{¶51} Claiming the jury lost its way in concluding he was driving, Appellant reiterates if he was not the driver of the vehicle, then evidence of his control over the meth (for count one) would be weakened. Likewise, he applies this reasoning to count two (failure to comply with an order or signal of a police officer) and count four (receiving stolen property). As recited in the prior assignment of error, Deidra's testimony initially claimed she believed she was driving during the pursuit while noting her memory of it was "really fuzzy." (Tr. 294-295). She acknowledged her written statement at the hospital reported Appellant was driving during the police pursuit. When asked whether she was testifying truthfully about being the driver, Deidra concluded, "I thought I was driving, but I guess I wasn't." (Tr. 316). Her exclamation to law enforcement after the chase also consistently placed Appellant in the driver seat.

{¶52} This was consistent with the testimony of the sergeant who saw a male driver and female passenger when he pulled up next to the fleeing truck on the freeway and the testimony of the trooper who viewed Appellant in the driver's seat just after the truck stopped and was still spinning its wheels in the field. The video evidence shows Deidra alighted from the passenger side of the vehicle and Appellant eventually exited the truck from the driver's door.

{¶53} Furthermore, Appellant informed law enforcement at the scene that Deidra did not do anything (while asking why she was handcuffed). (Tr. 204-205). Notably, his official statement to law enforcement *admitted he was the driver* during the chase, as did his statement to medical personnel. The jurors did not lose their way in concluding Appellant was the driver.

{¶54} Finally, Appellant challenges the weight of the evidence on count three, tampering with evidence. Specifically, he argues Deidra's mention of him ingesting fentanyl to avoid going to jail was not confirmed by any other evidence. Deidra's statement said after the tires were blown, Appellant pulled out a piece of aluminum foil, declared it contained more than a gram of fentanyl, and swallowed the substance while talking about not going to jail. (Tr. 314). She recanted portions of her written statement at trial. However, her testimony maintained that she witnessed Appellant consume a drug he declared was fentanyl. (Tr. 326). Law enforcement officers learned of this drug ingestion during their phone communications with the vehicle occupants during the chase and subsequent standoff, and they were waiting with Narcan for his surrender.

{¶55} Appellant also told hospital personnel he took marijuana, meth, and then a "pile" or "quite of bit" of fentanyl. His blood work did not show fentanyl, but it did show meth and ecstasy/MDMA (as well as cannabinoids), which suggests he ingested a substance near the end of the chase which he thought was fentanyl (or which he falsely claimed was fentanyl knowing it was ecstasy or more meth). The tampering with evidence charge did not require accurate knowledge of the specific substance being destroyed or concealed in order to impair its availability as evidence. From all the evidence and circumstances, the jury did not lose its way and create a manifest miscarriage of justice by concluding Appellant while "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, . . . destroy[ed], conceal[ed], or

remove[d] any . . . thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1),(B).

**{¶56}** In summary, the jury saw Deidra testify and was able to listen to her voice inflection and watch her demeanor, eye movements, and gestures, which are all useful in adjudging truthfulness or lack thereof. It was within the jury's province to weigh her testimony and assign value to each statement and each piece of evidence presented at trial. "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Perkins*, 2025-Ohio-634, ¶ 70 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971).

**{¶57}** We incorporate our Statement of the Case, which further details the trial testimony and evidence reviewed. Upon such review of all the testimony and evidence, we cannot conclude this is the exceptional case where the jury lost its way and created a manifest miscarriage of justice so as to require a new trial. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

**{¶58}** Appellant's third assignment of error contends:

"The trial court erred in denying Appellant's Motion to Dismiss for Speedy Trial Violation, in violation of Appellant's right to a speedy trial under R.C. 2945.71, the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution."

**{¶59}** The United States Supreme Court declined to establish exact speedy trial parameters and allowed states to prescribe a reasonable period of time consistent with the constitutional framework. *Barker v. Wingo*, 407 U.S. 514, 523 (1972). In accordance, the State of Ohio's speedy trial statutes designate particular time requirements while setting forth tolling events and other relevant matters. *See* R.C. 2945.71 through R.C. 2945.73. Although the statutes are strictly construed against the state, the trial court's findings of fact are given deference if supported by competent, credible evidence. *State v. McDaniel*, 2023-Ohio-3593, ¶ 19 (7th Dist.).

**{¶60}** "A person against whom a charge of felony is pending . . . shall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). The triple time provision states, "each day during which the accused is held in jail in lieu

of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). Thus, the state had 90 days to bring Appellant to trial. Appellant was incarcerated from his May 18, 2024 apprehension through the trial, which began on October 10, 2024.

{¶61} However, the statutory time may be extended under the circumstances listed in R.C. 2945.72(A)-(J). For instance, at a July 15, 2024 pretrial, the court granted a joint request for a continuance of the August 1, 2024 jury trial. (7/24/24 J.E.). After a continued pretrial at which the parties informed the court about unsuccessful negotiations, the court set the jury trial for September 12, 2024. (8/14/24 J.E.). Appellant acknowledges the jointly requested continuance tolled the statutory speedy trial time through the rescheduled trial date of September 12, 2024. R.C. 2945.72(H) ("The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion" extends the speedy trial time).

{¶62} Appellant's statutory speedy trial argument initially challenges the trial court's tolling of 13 days instead of 6 days for discovery. He agrees his discovery request tolled the time by the six days between his motion and the state's response. *See State v. Brown*, 2002-Ohio-7040, ¶ 22 (where the Supreme Court held discovery requests by the defendant are tolling events), applying R.C. 2945.72(E) (speedy trial time is extended by any period of delay necessitated by reasons of a motion made by the accused). However, he asserts the state's demand for discovery would not similarly toll the time because he timely responded within 7 days. *See State v. Palmer*, 2007-Ohio-374, ¶ 24 (where 30 days passed without a discovery response from the defendant, the Supreme Court held "defendant's failure to respond within a reasonable time to a prosecution request for reciprocal discovery constitutes neglect that tolls the running of speedy-trial time"), applying R.C. 2945.72(D) (tolling speedy trial time by any period of delay occasioned by the neglect or improper act of the accused).

{¶63} In any event, the trial court's other tolling decisions would have to be incorrect to sustain Appellant's statutory speedy trial argument here. Accordingly, Appellant relies upon his contention that the three continuances subsequent to the joint continuance were not reasonable as required by the speedy trial statute. *See* R.C. 2945.72(H) (extending the time by the period of "any reasonable continuance" when the request is other than by the accused).

Case No. 24 BE 0055

**{¶64}** First, on August 21, 2024, the state filed a written motion to continue the September 12, 2024 trial date. The motion explained, "For cause, a necessary and indispensable witness, the lead law enforcement investigator in this matter, is unavailable due to a previously scheduled vacation." The state asserted its motion was filed immediately upon receiving notice from the officer. The court granted the motion and continued the trial by one week, until September 19, 2024. (8/27/24 J.E.). There was nothing unreasonable about seeking or issuing this continuance. "The unavailability of a State's witness is a reasonable basis for a continuance." *State v. Travers*, 2024-Ohio-3076, ¶ 27 (7th Dist.), citing *State v. Christian*, 2014-Ohio-2590, ¶ 18 (7th Dist.). The fact witness' unavailability was due to an arresting officer's vacation does not make the state's request or the continuance unreasonable. *State v. Saffell*, 35 Ohio St.3d 90, 91-92 (1988).

**{¶65}** As to the second disputed continuance, the trial court issued a judgment explaining when granting the state a continuance until September 19, 2024 the court "inadvertently failed to account for a continuing education seminar it was attending on that same date." As a result, "due to the unavailability of the Court," trial was continued to the "first available date" of September 26, 2024. (9/10/24 J.E.). Contrary to Appellant's contention, it was not unreasonable to extend the one-week continuance by another week when the court realized that two weeks earlier it should have granted a longer continuance to avoid its previously scheduled obligation. *See Saffell* at 92 (after continuance for officer's vacation, the trial date was reasonably set at earliest date after the judge returned from a week out of town).

**{¶66}** The third disputed continuance occurred when, at the September 24, 2024 pretrial, the state orally moved to continue the jury trial due to the unavailability of Sergeant Moore, who was described as "a necessary indispensable witness." The prosecutor pointed out Sergeant Moore had direct involvement with Appellant and was "essential" to the case. (Tr. 4). The defense generally objected, asking the court to order the trial to proceed that week. (Tr. 5). The court granted a continuance until October 10, 2024. (9/25/24 J.E.). In the meantime, Appellant filed his speedy trial motion on October 4, the court denied the motion on October 8, and the trial proceeded on October 10, 2024.

**{¶67}** In protesting this final continuance, Appellant ponders whether Sergeant Moore was the same witness mentioned in the state's first request for a continuance (filed

in writing on August 21, 2024). If so, he concludes the final request for a continuance would be unreasonable. He notes the state's written motion did not name "the lead law enforcement investigator in this matter" who was described as "a necessary and indispensable witness" who was "unavailable due to a previously scheduled vacation."

**{¶68}** However, the trial testimony indicated the lead investigator was Sergeant Brannan as she: "became the officer in charge"; "began processing the evidence and beginning the case" after securing the large bag of meth and booking Deidra into the jail; received the small bag of meth and drug paraphernalia from another trooper and submitted the evidence to the lab; and took "other steps regarding this investigation" such as contacting the owner of the stolen truck. (Tr. 347-348, 354). We also note the defense did not delve into this topic when generally objecting to the state's September 24, 2024 oral request for a continuance. This is because Sergeant Brannan was already known by the defense to be the main investigator from the investigative report. This report was filed in the common pleas court with the transcript from the county court after the preliminary hearing and bindover to the grand jury, provided in discovery, and referenced at trial by the defense.

**{¶69}** As the three contested continuances were reasonable, Appellant's statutory speedy trial argument is without merit.

**{¶70}** Furthermore, the speedy trial statute says, "each day during which the accused is held in jail in lieu of bail *on the pending charge* shall be counted as three days." (Emphasis added.) R.C. 2945.71(E). The state's response to Appellant's speedy trial motion attached two separate warrants in effect for Appellant. One warrant was from a court in Marietta, Ohio forwarded to the sheriff's office on March 18, 2024, the day of Appellant's arrest. The other warrant was from the West Virginia Division of Corrections and Rehabilitation for a parole hold issued on April 10, 2024 and forwarded to the sheriff's office for detainer on May 20, 2024; this information was also in the bindover filings.

**{¶71}** Appellant's speedy trial argument assumes the triple count applies without discussing the effect of a warrant or detainer on the time calculation. The Supreme Court has pointed out triple time "applies only when the defendant is being held in jail solely on the pending charge. Thus, the triple-count provision does not apply when a defendant is being held in custody pursuant to other charges. Nor does it apply when the accused is

being held on a parole- or probation-violation holder." (Citations omitted.) *State v. Sanchez*, 2006-Ohio-4478, ¶ 7.

{¶72} Finally, as emphasized by the state and as pointed out by the trial court, the speedy trial statute's new "last chance provision" provides:

> (C)(1) A person charged with a felony, who is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code, is eligible for release from detention. The court may release the person from any detention in connection with the charges pending trial and may impose any terms or conditions on the release that the court considers appropriate.
>
> (2) Upon motion made at or before the commencement of trial, but not sooner than fourteen days before the day the person would become eligible for release pursuant to division (C)(1) of this section, the charges shall be dismissed with prejudice *unless the person is brought to trial on those charges within fourteen days after the motion is filed and served on the prosecuting attorney*. If no motion is filed, the charges shall be dismissed with prejudice unless the person is brought to trial on those charges within fourteen days after it is determined by the court that the time for trial required by sections 2945.71 and 2945.72 of the Revised Code has expired. If it is determined by the court that the time for trial required by sections 2945.71 and 2945.72 of the Revised Code has expired, no additional charges arising from the same facts and circumstances as the original charges may be added during the fourteen-day period specified under this division. The fourteen-day period specified under this division may be extended at the request of the accused or on account of the fault or misconduct of the accused.

(Emphasis added.) R.C. 2945.73(C) (as amended effective April 2, 2023). *Compare* Former R.C. 2945.73(B) ("Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code.").

{¶73} Appellant's brief does not address the trial court's alternative reliance on this provision. As the trial was held within 14 days of Appellant's motion, the trial court did not err overruling the statutory speedy trial motion to dismiss based on R.C.

Case No. 24 BE 0055

2945.73(C)(2).  *See, e.g., State v. Johnson*, 2025-Ohio-1009, ¶ 22-23 (3d Dist.); *see also State v. Knott*, 2024-Ohio-2289, ¶ 49 (2d Dist.) ("Only if the defendant's case is not tried within that 14-day grace period are the defendant's criminal charges to be dismissed with prejudice.").

**{¶74}** In addition to arguing a statutory speedy trial violation, Appellant raises a constitutional speedy trial violation.  The Ohio Supreme Court emphasizes a defendant is coextensively "guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution."  *State v. Taylor*, 2002-Ohio-7017, ¶ 32.  A constitutional speedy trial claim considers the reasonableness of the delay by balancing four factors:  (1) the length of the delay; (2) the reason for the delay; (3) how and when the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant from the delay.  *Barker*, 407 U.S. at 530-532; *Taylor* at ¶ 38.

**{¶75}** To trigger a constitutional speedy trial analysis, the defendant must make a threshold showing of a "presumptively prejudicial" delay.  *Doggett v. United States*, 505 U.S. 647, 652 (1992).  "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case."  *Barker* at 530-531 (the tolerable delay increases with the complexity and seriousness of the case).  Lower courts generally find the trigger satisfied as the trial delay approaches one year.  *See Doggett* at fn. 1.  Still, even where the delay approached one year, the Ohio Supreme Court observed, "The fact that appellant was brought to trial within a year of the murders can hardly allow the delay to be characterized as 'presumptively prejudicial,' a label that ordinarily triggers a constitutional speedy trial analysis and inquiry into the remaining *Barker* factors."  *Taylor* at ¶ 38.

**{¶76}** Here, the time between Appellant's arrest on the day of the offenses and the day trial commenced was *less than five months*.  In accordance, the constitutional speedy trial trigger was not invoked as the length of the delay was minimal.

**{¶77}** Regardless, the reasons for the delay were explained and reasonable.  The first continuance was a jointly requested one.  The other continuances were based on reasonable requests.  And, those continuances were for very short periods (one week extended by another week and then a separate two weeks).  Appellant's claims of prejudice from the delay are not supported (lost opportunities to meet with counsel, review

discovery, and assist in trial preparation) or are unrelated to his trial (lost employment opportunities and the negative experience of being incarcerated).

**{¶78}** In conclusion, neither Appellant's constitutional nor statutory speedy trial rights were violated.  This assignment of error is without merit.

ASSIGNMENT OF ERROR FOUR

**{¶79}** Appellant's fourth assignment of error provides:

"The trial court abused its discretion in declaring Deidra Hines to be a hostile witness under Evid.R. 607."

**{¶80}** In fulfilling the duty of exercising "reasonable control over the mode and order" of witness interrogation and evidence presentation, one function of the trial court is to "make the interrogation and presentation effective for the ascertainment of the truth . . ." Evid.R. 611(A).  "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."  Evid.R. 611(C).  Nevertheless, as observed by the Supreme Court, the trial court has discretion to allow leading questions on direct examination.  *State v. Drummond*, 2006-Ohio-5084, ¶ 138.

**{¶81}** Appellant raises the impeachment and the leading questions permitted when Deidra was characterized as a hostile witness based on the following rule:

> "Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

Evid.R. 607(A).

**{¶82}** The trial court's decision to declare the witness "hostile" for surprise recantation under Evid.R. 607(A) is reviewed under the abuse of discretion standard of review.  *Davie* at 323 (1997).  An abuse of discretion involves an unreasonable, arbitrary, or unconscionable decision.  *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). Under such standard, we do not substitute our judgment for that of the trial court.  *State v. Herring*, 94 Ohio St.3d 246, 255 (2002).

Case No. 24 BE 0055

**{¶83}** The existence of affirmative damage under Evid.R. 607(A) was not contested below. (Tr. 296-309). Thus, arguments on that aspect of the rule were waived and cannot be accepted by an appellate court in the absence of plain error. Evid.R. 103(A)(1) (objection stating the specific ground of objection or admission of evidence waived); Civ.R. 52(B) (plain error rule applied at the appellate court's discretion). Nor was the affirmative damage aspect of the rule specifically challenged on appeal (until the reply, which is not an available avenue for making new arguments). *See, e.g., In the Matter of M.L.S.*, 2022-Ohio-2195, ¶ 36 (7th (Dist.).

**{¶84}** Regardless, the state would have clearly suffered affirmative damage under Evid.R. 607(A) due to the change in Deidra's story about who was driving the truck during the pursuit. She began by stating she drove after their last stop. When asked what happened next, she mentioned, "it's really fuzzy" but then immediately declared, "*I just know* that we were -- there was a lot of arguing after the cops got behind us and stuff, so *I drove for as long as I could*." (Tr. 294). When asked when she stopped driving, she answered, "I'm not sure exactly when. I know we hit some strips and ended up in a swamp in Belmont County." When asked if she was driving the whole time, she said, "I think I was. I was pretty sure I was." (Tr. 295).

**{¶85}** Therefore, contrary to her statements during and shortly after the chase, Deidra testified she was the driver during the chase. The fact that she subsequently said, "I can't really remember everything" did not transform her inconsistent statement to a mere lack of remembrance (as contended in Appellant's reply brief). In accordance, the prosecutor declared the prior representations by Deidra were contrary to her current testimony and claimed Deidra was a hostile witness due to the surprise; he pointed out he just met with her the day before trial. (Tr. 300-301).

**{¶86}** Appellant argues the trial court should have rejected the prosecutor's claim of surprise and sustained his objection on surprise, which would have prevented the use of Evid.R. 607(A) and 611(C) to impeach Deidra Hines and ask her leading questions. He claims the evidence showed the prosecution had reason to believe Deidra would change her initial statements and testify favorably to the defense.

**{¶87}** Where testimony of a witness is materially inconsistent with the prior statement of the witness and the attorney calling the witness "did not have reason to believe" the witness would recant, the requirement of surprise will be considered satisfied.

*State v. Eason*, 2003-Ohio-6279, ¶ 124 (7th Dist.); *see also State v. Davie*, 80 Ohio St.3d 311, 323 (1997) ("The prosecution had no reason to believe [the murder defendant's girlfriend] would testify as she did at trial, since her prior statements to police and the grand jury were consistent. Thus, the element of surprise was established.").

**{¶88}** Although "no reason to believe" will satisfy the surprise test for material inconsistent testimony, the test may still be satisfied even if a prosecutor has a pretrial concern about what a reluctant witness with strong bonds to the defendant may do at trial. *See id.* at ¶ 124-125 (court could accept state's reasonable explanation about why it was surprised despite reluctant witness); *see also State v. Johnson*, 2023-Ohio-4734, ¶ 24-26 (7th Dist.) (the state's surprise was not diminished by the fact the hostile witnesses were the defendant's mother and his girlfriend).

**{¶89}** During Deidra's testimony, a recess was called in order to conduct a hearing on the defense objection to the lack of foundation for the state's surprise. At the hearing outside the presence of the jury, the prosecutor attested to his surprise and asked to confirm the reason for his surprise by questioning Deidra. It was then elicited that during a meeting with the prosecutor the day before trial, Deidra started saying she was the driver. However, she soon got upset after listening to some of Appellant's jail calls wherein he did not speak favorably of her. In addition, the prosecutor reminded her at the meeting that she made prior statements to law enforcement saying Appellant was driving, including a lengthy detailed statement about all of their actions before and during the chase. (Tr. 303). At the hearing, Deidra acknowledged she then begged the prosecutor not to make her testify because she would be the "nail in [Appellant's] coffin" and she called her mother from jail after the meeting and again described her upcoming testimony as the "nail in his coffin." (Tr. 304-306).

**{¶90}** Despite using this nail in the coffin terminology about what her testimony would mean to Appellant's case, Deidra claimed at the in camera hearing that she did not mean to suggest she was planning to testify in accordance with her prior statements. However, the trial court emphasized the implication of an eyewitness or accomplice witness saying they would be the nail in someone's coffin by testifying. Considering the reasonable inferences, the court properly concluded it was illogical for the witness to claim she left the prosecutor with the impression she was going to testify differently than her prior statements. (Tr. 308).

Case No. 24 BE 0055

**{¶91}** Contrary to Appellant's contention, the fact he was heard in a jail call on the night of the first day of trial telling someone he believed Deidra was going to say she was driving did not necessarily diminish the prosecution's expectations of Deidra at trial due to the statements she made to the prosecutor at the end of her meeting with him the day before trial, which led the state to believe she would be maintaining her prior statements that Appellant was the driver.  (Tr. 295); (St. Ex. 11, jail call 10/10/24).  If at a meeting on the day before trial, a witness starts to repudiate a prior statement but then reverts to a position corresponding to their original statements incriminating the defendant and ends the meeting on that note, a trial judge has the discretion to reasonably conclude the prosecution lacked forewarning of a recantation and was surprised at trial.[1]

**{¶92}** The issue of whether the prosecutor was surprised by their witness' testimony was a particularly factual question, involving the trial court's credibility determinations when weighing the prosecutor's explanation or rationale with Deidra's in-chambers testimony at the meeting the day before trial.  In ascertaining the prosecutor's surprise or the meaning of a witness' comments at the pretrial meeting, the trial judge occupies the best position from which to ascertain the truthfulness of the assertions made to the court on the subject.  The court was able to consider voice inflection, demeanor, eye movements, and gestures, which are all useful in adjudging truthfulness or lack thereof.  Contrary to Appellant's argument here, the trial court did not abuse its discretion, as the decision finding surprise under Evid.R. 607(A) was not arbitrary, unreasonable, or unconscionable[2]. This assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE

**{¶93}** Appellant's fifth assignment of error states:

---

[1] In addition, where the prosecution learns of repudiation just before the testimony is to be presented, the trial court may call the witness as its own, allowing the state to cross-examine the witness without regard to surprise.  *State v. Apanovitch*, 33 Ohio St.3d 19, 22 (1987); *see also State v. Webb*, 70 Ohio St.3d 325, 340-341 (1994).  Also, diminishing the asserted prejudice, Appellant's own admission to law enforcement indicated he was driving.

[2] We also point out the hostile witness rule specifies it "does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803."  Evid.R. 607(A).  Evid.R. 803 contains hearsay exceptions such as present sense impression, excited utterance, then-existing state of mind, and recorded recollection.  For instance, consistent with law enforcement testimony about personally seeing Appellant behind the wheel during the operation of the vehicle, testimony disclosed *Deidra made mid-pursuit declarations over the phone indicating Appellant was driving*.  Additionally, as Deidra's testimony on driving also claimed her memory was fuzzy, the recorded recollection exception would have initially allowed an attempted refreshment of her memory from her written statement.

"The trial court's sentence of Appellant was contrary to law for imposing mandatory prison sentences on Counts Two, Three, and Four."

{¶94} In imposing consecutive sentences of 7 years on count one, 36 months on count two, 24 months on count three, and 12 months on count four, the court described the aggregate sentence of 13 years as "mandatory." (Tr. 12); (11/6/24 J.E.). However, the only offense carrying a mandatory sentence was count one, aggravated possession of drugs. That is, pursuant to the statute defining the offense in count one, "the court shall impose as a mandatory prison term a second degree felony mandatory prison term." R.C. 2925.11(C)(1)(c); *see also* R.C. 2929.13(F)(5) ("shall not reduce the term or terms pursuant to section 2929.20, division (A)(2) or (3) of section 2967.193 or 2967.194, or any other provision of Chapter 2967. or Chapter 5120. of the Revised Code for . . . A first, second, or third degree felony drug offense for which . . . 2925.11 . . . requires the imposition of a mandatory prison term").

{¶95} To the contrary, the law does not provide or allow for a "mandatory prison term" on counts two, three, and four. *See* R.C. 2921.331 (failure to comply with an order or signal of a police officer); R.C. 2921.12 (tampering with evidence); R.C. 2913.51 (receiving stolen property); *see also* R.C. 2929.13(F) (list of offenses with sentences that cannot be reduced); R.C. 2929.14(B). For our purposes, a "mandatory prison term" is "the term in prison that must be imposed for the offenses or circumstances set forth in divisions (F)(1) to (8) or (F)(12) to (21) of section 2929.13 and division (B) of section 2929.14 of the Revised Code." R.C. 2929.01(X)(1).[3]

{¶96} Appellant emphasizes the significance of labeling a sentence as mandatory, noting it requires the prisoner to serve the entire "day for day" sentence with no opportunity for judicial release or earned credit. For instance, the judicial release statute requires an eligible offender to be "serving a stated prison term that includes one or more nonmandatory prison terms." R.C. 2929.20(A)(1)(a). A nonmandatory prison term is "a prison term that is not a mandatory prison term." R.C. 2929.20(A)(4). "If the aggregated

---

[3] We note division (C) of R.C. 2929.14 is not one of the statutory divisions listed in the definition of mandatory prison term. R.C. 2929.01(X)(1), citing, e.g., R.C. 2929.14(B) and R.C. 2929.13(F)(5) (relevant to count one). In the next assignment of error, we discuss the application of R.C. 2929.14(C)(3) to Appellant's consecutive sentence on count two, which required a consecutive sentence on that count where a court exercises its discretion to impose a prison term in the first instance.

nonmandatory prison term or terms is more than five years but not more than ten years, the eligible offender or state of emergency-qualifying offender may file the motion not earlier than the date on which the offender has served five years of the offender's stated prison term or, if the prison term includes a mandatory prison term or terms, not earlier than five years after the expiration of all mandatory prison terms." *See* R.C. 2929.20(C)(1)(d).

**{¶97}** By way of further example, a prisoner in a state correctional institution can receive earned credit toward certain sentences. *See* R.C. 2967.14(A)(2),(3)("unless a person is serving a mandatory prison term"); *see also* R.C. 2967.193. However, this earned credit cannot be awarded if the prisoner "is serving a prison term that section 2929.13 or section 2929.14 of the Revised Code specifies cannot be reduced pursuant to this section or this chapter . . ." R.C. 2967.14(C)(1).

**{¶98}** The state concedes counts two, three, and four do not involve mandatory prison terms and thus the aggregate sentence of 13 years could not be characterized as entirely mandatory. The state agrees this label prejudices Appellant, such as by depriving him of statutory earned credit.

**{¶99}** Where a trial court imposes a mandatory prison term on a count when a mandatory term was not authorized by statute, that portion of the sentence is contrary to law. *State v. Rodriguez*, 2023-Ohio-805, ¶ 22 (8th Dist.). Accordingly, this assignment of error has merit.

**{¶100}** Pursuant to R.C. 2953.08(G)(2)(b), if we clearly and convincingly find the sentence is contrary to law, we take "any action authorized by this division [G.]" Specifically, the reviewing court "may increase, reduce, or otherwise modify a sentence . . . or may vacate the sentence and remand the matter to the sentencing court for resentencing." R.C. 2953.08(G)(2), citing (A)(4) (allowing an appeal if the sentence is contrary to law).

**{¶101}** Appellant asks this court to vacate the sentence with a remand for resentencing *or* to *modify* his sentence to remove the mandatory designation on counts two through four. In lieu of the remanding for resentencing option, the state asks this court to simply modify Appellant's sentence to label as mandatory only the 7 years imposed on count one and remove the mandatory label from the prison terms imposed

on counts two, three, and four. (St.Br. at 6, 14-15). This requested procedure of modifying the sentence without remanding is proper under R.C. 2953.08(G)(2).

{¶102} In many cases, we nevertheless remand under the theory that the record is cleaner if the trial court issues the sentencing order (rather than a defendant or a state agency having to rely on the sentencing order plus this court's judgment). Here, we cannot order the trial court to issue a nunc pro tunc entry because the trial court also made the error at the sentencing hearing. *See State v. Bonnell*, 2014-Ohio-3177, ¶ 30-31 (where the Supreme Court explained a court is ordered to issue a nunc pro tunc entry to reflect what actually occurred in open court). In such cases where a nunc pro tunc option is not available, we often vacate the sentence and remand for resentencing. *See, e.g., State v. Fowler*, 2021-Ohio-2854, ¶ 53-58 (7th Dist.) (where the imposition of a mandatory prison term on the sole count was contrary to law due to a Supreme Court precedent striking the relevant sentencing provision).

{¶103} Still, the statute expressly allows a sentence modification by the appellate court, and as the Supreme Court points out, "a remand is just one arrow in the quiver" belonging to the appellate court due to the options available under R.C. 2953.08(G)(2), including correcting a non-discretionary defect in a sentence without a remand. *State v. Fischer*, 2010-Ohio-6238, ¶ 29, *overruled on other grounds by State v. Harper*, 2020-Ohio-2913. The trial court's mandatory sentence language applied to non-mandatory sentences was not a discretionary item. We also point out this case did not involve a plea agreement but sentencing after a jury trial so there is no issue of a misadvisement affecting the plea. Plus, the state only noted at sentencing that count one carried a mandatory sentence and did not suggest the sentence was mandatory on other counts. To avoid increased costs to the state, the logistics of transportation from prison to local incarceration, further delay in the correction of Appellant's sentence, and potential attempts at appealing other sentencing matters later, this court modifies Appellant's sentence so that only the sentence of 7 years on count one, aggravated drug possession, is a mandatory prison term, and the consecutive sentences imposed on counts two, three, and four are not mandatory prison terms. The precise modified language is contained in the conclusion of this opinion and the attached judgment below.

## ASSIGNMENT OF ERROR SIX

{¶104} Appellant's sixth and final assignment of error alleges:

Case No. 24 BE 0055

"The trial court's imposition of consecutive sentences was contrary to law, for failing to make the required findings to impose consecutive sentences required under R.C. 2929.14(C)(4), either at Appellant's sentencing hearing or in the trial court's sentencing entry."

{¶105} The statutory presumption in favor of concurrent sentences has exceptions, including if R.C. 2929.14(C) provides otherwise. R.C. 2929.41(A). As to count two (felony failure to comply with an order or signal of a police officer), R.C. 2929.14(C) provides otherwise: "If a prison term is imposed for . . . a felony violation of division (B) of section 2921.331 of the Revised Code, the offender shall serve that prison term consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender." R.C. 2929.14(C)(3), *see also* R.C. 2921.331(B) ("No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."), (C)(5)(a)(ii) (third-degree felony if substantial risk of serious physical harm).

{¶106} Correspondingly, the statute defining the offense in count two required any prison term the court chose to impose to be served consecutively to any other prison term. R.C. 2921.331, (D) ("If an offender is sentenced to a prison term for a violation of division (B) of this section, the offender shall serve the prison term consecutively to any other prison term or mandatory prison term imposed upon the offender."). The state pointed this out at sentencing and on appeal.

{¶107} The trial court decided to impose a prison term on count two, and thus, a consecutive sentence was required on that count (in relation to the longest imposed prison term of 7 years on count one). Accordingly, the statutory requirement of consecutive sentence findings was not applicable to that consecutive sentence. Thus, at most, Appellant's argument would apply to the decision to run count three (24 months) and count four (12 months) consecutively.

{¶108} The appellate court may reverse a sentence if it clearly and convincingly finds: (a) the record does not support the sentencing court's findings under certain listed statutory provisions, including the consecutive sentence findings in R.C. 2929.14(C)(4); or (b) the sentence is otherwise contrary to law. R.C. 2953.08(G)(2)(a)-(b). As Appellant emphasizes, a sentence is contrary to law if the court failed to make one of the required

consecutive sentencing findings (even if the record supports such a finding). *See State v. Moore*, 2024-Ohio-3256, ¶ 24 (7th Dist.).

**{¶109}** Where a statute does not require a consecutive sentence for an offense, the trial court imposing consecutive sentences for multiple convictions must make the required R.C. 2929.14(C)(4) findings at the sentencing hearing, and it must incorporate those findings into the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, ¶ 29, 37. At least three findings must be made under the statute: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger he poses to the public; and (3) the existence of one of the following alternatives:

> a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

**{¶110}** The court began its comments at the sentencing hearing by pointing out: "You were on parole from West Virginia. You had pending charges in Marietta. You abandoned an elderly lady. You take her truck. You go on a 24-hour drug binge, ending with a 60-mile long high-speed chase down Interstate 70, putting everybody who's on the interstate at risk; 60 miles this went, at speeds above a hundred, or close to a hundred." (Tr. 7-8). Both at the sentencing hearing and in the sentencing entry, the court referred to the purposes and principles of sentencing and the seriousness and recidivism factors.

Case No. 24 BE 0055

The court then found Appellant had a history of felony convictions including receiving stolen property, breach of recognizance bond, grand theft of a firearm, breaking and entering, entering a structure to commit larceny, and grand larceny. The court noted misdemeanor convictions of driving under suspension and destruction of property with intent. It was further pointed out Appellant served three prior prison terms, showed a likelihood of recidivism by continuing to engage in the same criminal behavior, and did not respond favorably to prior sanctions as demonstrated by his record of convictions, incarceration, and multiple probation revocations. The court again emphasized Appellant committed the offenses "with a case pending in another Court and while on parole out of the State of West Virginia."

**{¶111}** Next, the court spoke of its sentence as being the minimum it could impose and still "protect the public from future crime by the offender and others and to punish the offender" and concluded: "The Court further finds in accordance with the above factors and others, that consecutive prison terms are necessary in this action so as to protect the public from further crime and to punish him. Consecutive sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger he poses to the public." The court also said it made all its findings based on R.C. 2929.11, R.C. 2929.12, R.C. 2929.13, and R.C. 2929.14.

**{¶112}** Appellant does not contest the court sufficiently announced the first two findings required by R.C. 2929.14(C). Rather, he contends the court failed to sufficiently announce one of the alternatives to satisfy the third required finding. We disagree.

**{¶113}** "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29. The trial court is not required "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record . . . ." *Id.* at ¶ 37 (and the court "has no obligation to state reasons to support its findings").

**{¶114}** The Supreme Court has ruled that the trial court's mention of a defendant committing the offenses while "already under arrest on a previous case" was sufficient to constitute a finding under subdivision (a) that he committed one of the offenses while awaiting trial or sentencing. *State v. Jones*, 2024-Ohio-1083, ¶ 15-16. The Court

Case No. 24 BE 0055

alternatively opined a trial court's detailed statement about a defendant's criminal history "evinces a finding" under subdivision (c) that his history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crime by the defendant. *Id.* at ¶ 6-8, 16.

**{¶115}** The state argues we can discern the third finding was satisfied for two separate reasons, urging the trial court's statements evinced holdings under both subdivisions (a) and (c). That is, the trial court made a detailed statement about Appellant's criminal history and said the chosen sentence represented the minimum required to "protect the public from future crime by the offender, which "evinces a finding" under subdivision (c) that his history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crime by the defendant. And, the record shows the listed criminal convictions and probation violations plus a multitude of arrests. *See id.* at ¶ 12 (the review of the entire trial court record includes any investigative report submitted to the trial court before the imposition of sentence), citing R.C. 2953.08(F). The record also supports the trial court's finding that Appellant committed the offenses while on parole in West Virginia (and shows a parole warrant issued the month before the charges in this case). Although Appellant does not specifically argue this parole would not qualify as post-release control for purposes of the consecutive sentence finding in R.C. 2929.14(C)(4)(a), the parole finding is nevertheless part of Appellant's history of criminal conduct, which would be relevant to a finding under (C)(4)(c).

**{¶116}** In any event, by stating he committed the current offenses "with a case pending in another Court," the trial court sufficiently made the finding under R.C. 2929.14(C)(4)(a) that Appellant committed the offenses while awaiting trial or sentencing. We note the simple statutory language in subdivision (a) contains no discretionary modifying phrase, such as contained in subdivision (c), which a trial judge should use to ensure the reviewing court can "glean" the requisite consecutive sentence consideration was made. *Compare* R.C. 2929.14(C)(4)(a) ("The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing . . .") *to* (c) ("The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."). Although not specifically raised on appeal, we also point out the record supports the statement about

Case No. 24 BE 0055

Appellant committing the offenses in the current case while he was awaiting trial or sentencing in another case (a felony case pending in Marietta, Ohio since 2022). *See* R.C. 2953.08(G)(2)(a) (on issue of whether the record supports consecutive sentence findings, the court must uphold the sentence unless it clearly and convincingly finds the record does not support the findings). In accordance, this assignment of error is without merit.

<u>CONCLUSION</u>

**{¶117}** For the foregoing reasons, assignments of error one, two, three, four, and six are overruled. As conceded by the state, assignment of error five is sustained because the court's labeling of counts two, three, and four as mandatory sentences was contrary to law. Accordingly, Appellant's convictions are affirmed, but the November 6, 2024 sentencing entry and a corresponding journal entry are hereby modified to correct the sentencing error so they hereafter state the following:

**{¶118}** "The only mandatory sentence is the 7-year prison term imposed on count one, aggravated possession of drugs. The consecutive sentences imposed on count two (36 months for failure to comply with an order or signal of a police officer), count three (24 months for tampering with evidence), and count four (12 months for receiving stolen property) are not mandatory prison terms.

Waite, J., concurs.

Hanni, J., concurs.

<u>Case No. 24 BE 0055</u>

---

For the reasons stated in the Opinion rendered herein, assignments of error one, two, three, four, and six are overruled. Assignment of error five is sustained because the court's labeling of counts two, three, and four as mandatory sentences was contrary to law. Appellant's convictions are affirmed, but the November 6, 2024 sentencing entry and a corresponding journal entry are hereby modified to correct the sentencing error so they hereafter state the only mandatory sentence is the 7-year prison term imposed on count one, aggravated possession of drugs. The consecutive sentences imposed on count two (36 months for failure to comply with an order or signal of a police officer), count three (24 months for tampering with evidence), and count four (12 months for receiving stolen property) are not mandatory prison terms. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**